**CAL WADSWORTH CONSTRUCTION, a Utah corporation, Plaintiff and Petitioner,**

v.

**CITY OF ST. GEORGE, a municipality, Defendant and Respondent.**

No. 940091.

Supreme Court of Utah.

June 15, 1995.

Wilford A. Beesley, Stanford P. Fitts, Salt Lake City, for plaintiff.

Gary G. Kuhlmann, Jonathan L. Wright, St. George, for defendant.

HOWE, Justice:

We granted certiorari to review the court of appeals' decision affirming the district

court's judgment that the City of St. George did not award Cal Wadsworth Construction ("Wadsworth") a contract to construct improvements to a municipal airport terminal building. *Cal Wadsworth Constr. v. City of St. George,* 865 P.2d 1373 (Utah Ct.App. 1993), *cert. granted,* 878 P.2d 1154 (Utah 1994).

On December 27, 1990, the City opened the bidding for a project to expand the municipal airport terminal. Wadsworth submitted the lowest responsive bid, and the City Council met on January 10, 1991, to review the bid. Council members found that the bid exceeded the budget for the project and discussed the possibility of negotiating a bid reduction. During the discussion, the city manager informed Council members that Cal Wadsworth, principal shareholder of Wadsworth, had already objected to further negotiations until the City formally awarded Wadsworth the contract. His position was that the City should award the contract in the amount of the original bid and afterward negotiate reductions in the scope of the work and the contract price by submitting "work change orders," as authorized by the contract. After further discussion, the Council concluded that it would award the contract to Wadsworth on the condition that the parties negotiate the work and price to bring it within the City's budget. The Council added that if Wadsworth would not participate in these negotiations, it would rebid the project.

Nothing further transpired until January 29, 1991, when Mr. Wadsworth met in St. George with the project engineer, the architect, and Larry H. Bulloch, the city public works director. They informed him that he needed to cut $100,000 from the Wadsworth bid to bring it within the project budget. They suggested that this reduction could be accomplished by eliminating a canopy, a skylight, the sewer, or some combination of the three. Mr. Wadsworth stated that he was confident the reduction could be made but wanted to have additional information faxed to him from his office in Salt Lake City to confirm the cost reduction. By the next day, January 30, Mr. Wadsworth had received copies of his bid worksheets and he met

again with Mr. Bulloch. As will be more fully discussed later in this opinion, the testimony of the two men differs as to what was said between them. Briefly stated, Mr. Wadsworth testified that he agreed to reduce the price by $100,000 by eliminating the canopy and the skylight. Mr. Bulloch testified that Mr. Wadsworth expressed only "that he was confident" the price could be reduced by that amount by eliminating those two improvements through change orders once a formal written contract was signed.

The City had no further contact with Wadsworth and, on February 7, 1991, announced that it would reject all bids as over-budget and rebid the project. Soon after, Wadsworth filed this action against the City, seeking damages in the amount of the profit it would have made on the contract. The district court ruled in favor of the City, holding that the City intended to accept Wadsworth's bid only on condition that Wadsworth reduce it to conform to the project's budget and Wadsworth failed to meet this condition. Wadsworth appealed to the court of appeals, which affirmed the trial court's judgment. *Id.* at 1377. We granted certiorari to review the court of appeals' decision. 878 P.2d 1154.

Wadsworth assails the court of appeals' decision that a contract did not come into existence and presents three main issues for review. The first issue is whether Wadsworth formed a binding contract with the City by either submitting the lowest bid, relying on the actions of the City Council, or accepting the City's counteroffer. The second issue is whether the district court erred in refusing to admit two items into evidence: (1) an article in a trade publication announcing that the City had awarded the project contract to Wadsworth, and (2) a worksheet faxed to Mr. Wadsworth from Salt Lake City confirming that cancellation of the skylight and canopy would reduce the bid by $100,-000. The final issue is whether Wadsworth is entitled to recover lost profits for breach of contract.

## CONTRACT FORMATION

### A. *Submission of the Lowest Bid*

We begin by addressing the issue of whether a contract was formed between

Wadsworth and the City when Wadsworth submitted the lowest responsive bid. Wadsworth contends that case law which holds that advertisements for bids are not offers and cannot be "accepted" by submitting the lowest bid does not preclude this court from finding a contract. The City, Wadsworth asserts, went beyond simply soliciting for offers by requiring the bids to remain open for forty-five days and by requiring the bidder to furnish a bid bond.

■ A municipality's advertisement for bids is a solicitation for offers, and the responsive bids are offers which the city may then accept. *Rapp v. Salt Lake City*, 527 P.2d 651, 654 (Utah 1974). In deciding which bid to accept, the city may consider a variety of factors other than the amount of the bid, including the experience, skill, ability, and honesty of the bidders. *Schulte v. Salt Lake City*, 79 Utah 292, 300, 10 P.2d 625, 628 (1932). Thus, a municipality is not bound to accept a bid simply because it is the lowest. This is true even when the advertisement indicates that the municipality will contract with the lowest bidder. *Thatcher Chem. Co. v. Salt Lake City Corp.*, 21 Utah 2d 355, 358, 445 P.2d 769, 771 (1968). Because the local decision makers are in the best position to decide which bid is best for the municipality, courts will not interfere with their judgment unless fraud, dishonesty, collusion, or lack of good faith is involved. *Clayton v. Salt Lake City*, 15 Utah 2d 57, 59, 387 P.2d 93, 94 (1963); *Schulte*, 10 P.2d at 628.

■ In light of these principles, we cannot find that the City's advertisement rose to the level of an offer. Although the City required the bidders to leave their bids open for forty-five days and furnish a bond, these requirements are common to municipal bid solicitations and do not constitute an offer. *See, e.g., Concrete Prods. Co. v. Salt Lake County*, 734 P.2d 910, 911 (Utah 1987); *Breitling Bros. Constr., Inc. v. Utah Golden Spikers, Inc.*, 597 P.2d 869, 871 (Utah 1979); *Jaye Smith Constr. Co. v. Board of Educ.*, 560 P.2d 320, 321–22 (Utah 1977). In addition, as the City points out, its advertisement specifically reserved the right to reject any and all bids. When an advertisement reserves this right, no bidder may claim any contractual rights until the municipality awards him or her the contract. *John J. Brennan Constr. Corp. v. City of Shelton*, 187 Conn. 695, 702, 448 A.2d 180, 184 (1982); *see Clayton*, 387 P.2d at 94.

Wadsworth also argues that St. George City ordinance 9–5–4(5), which required the City to award contracts to the lowest responsive bidder, placed a mandatory duty on the City Council to award it the contract. It maintains that this duty was also implicit in ordinance 9–5–4(3), which allowed the City to reject a bid only if the bid exceeded the available funds by five percent or otherwise defeated the public interest. Wadsworth notes that the total budget for the project was $896,582 and its bid of $910,980 was less than five percent over this budget.

■ These city ordinances do not aid Wadsworth's position. Even when a city is governed by state or municipal laws that require it to award contracts to the lowest responsible bidders, the city has broad discretion to reject any or all bids. Utah Code Ann. § 10–7–20(2) (1992) ("The governing body has the right to reject any or all bids presented...."); *Clayton*, 387 P.2d at 94; *Schulte*, 10 P.2d at 628. Additionally, Wadsworth misinterprets ordinance 9–5–4(3), which gives the City Council "authority to reject all bids [or] parts of all bids ... when the lowest responsible bid exceeds available funds ... by more than 5%, or when the public interest will be served thereby and when permitted by law to do so." Although the ordinance specifies two circumstances under which the City Council may reject bids, section 10–7–20 reserves the City's power to evaluate the bids unilaterally. This reservation prevented a contract from forming when any bid, including the lowest bid, was received, because there was no mutuality of consideration. *Cf. Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985) (holding that reservation of an absolute and unconditional

power to terminate an executory contract renders the contract unenforceable for lack of mutual consideration).

### B. The City Council's Vote to Conditionally Award the Contract

Wadsworth's second contention is that the City awarded it the contract when the City Council voted to conditionally accept its bid at the meeting on January 10, 1991. Wadsworth asserts that its representatives reasonably believed that the City had awarded it the contract when the Council voted, the city architect informed Wadsworth of the award, and the city attorney requested subcontractor information "normally only requested after an award."

■■■ An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made. See Engineering Assocs., Inc. v. Irving Place Assocs., Inc., 622 P.2d 784, 787 (Utah 1980). At its January 10 meeting, the City Council clearly and unambiguously imposed a condition of price reduction on its acceptance of Wadsworth's bid. A Wadsworth representative attended the meeting and could not have reasonably concluded that the Council's actions amounted to an unqualified acceptance. In addition, the city architect made the City's condition clear to Mr. Wadsworth during a telephone discussion immediately before the council meeting. In light of these circumstances, Mr. Wadsworth could not reasonably assume that the city attorney's subsequent request for information about Wadsworth's subcontractors indicated an unqualified acceptance of its bid. Indeed, a request for information is a reasonable step in the negotiation process, even where, as here, the information requested is not normally disclosed before a contract is formed.

Wadsworth further argues that the condition imposed by the City should be disregarded because it was illusory and was not a "material qualification" of Wadsworth's offer, which incorporated a "changes provision" that would facilitate a reduction in price. It points out that it submitted its bid in compliance with the contract documents prepared by the City, which provided, "The [City] may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly." Wadsworth asserts that because this provision could facilitate a price reduction through cancellation of the skylight and the canopy, the City's condition was merely a restatement of terms already in the contract and did not qualify the City's acceptance.

■■■ An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer. Williams v. Espey, 11 Utah 2d 317, 322, 358 P.2d 903, 906 (1961); R.J. Daum Constr. Co. v. Child, 122 Utah 194, 200, 247 P.2d 817, 819 (1952); see 17 C.J.S. Contracts § 43 (1963) (stating that price and method of performance are two material terms of an offer). Also, the burden of proof for showing the parties' mutual assent as to all material terms and conditions is on the party claiming that there is a contract. B & R Supply Co. v. Bringhurst, 28 Utah 2d 442, 444, 503 P.2d 1216, 1217 (1972).

Wadsworth has not met its burden. Even though the City could have reduced Wadsworth's price by using the changes provision in the proposed contract, Darrell J. Didericksen & Sons, Inc. v. Magna Water & Sewer Improvement Dist., 613 P.2d 1116, 1118 (Utah 1980), the City chose to impose a condition on its acceptance of Wadsworth's bid. This condition was not rendered meaningless simply because another choice was available. As the City points out, use of the changes provision would not have assured the City of the same protection as precontract negotiations because any dispute between the two parties after the contract was entered into would have to be settled in

arbitration. By imposing the condition, the City maintained its negotiating power to secure for the public the most work for the best price. At any rate, the price and quantity of construction in Wadsworth's bid were two material terms which the City must have accepted to create a binding contract, and it specifically rejected them at the January 10 Council meeting.

■ The rest of Wadsworth's contentions are without merit. It argues that the City's conditional acceptance amounted to a full acceptance because the price reduction and cancellation of the skylight and the canopy did not change the "general scope of the work contracted." Whether these actions were within the general scope of the proposed contract is not relevant. That is relevant only when courts are faced with the issue of whether a change made pursuant to an established contract is so "cardinal" that it amounts to a breach of the contract. *Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346, 376 n. 9 (1990), *aff'd*, 931 F.2d 860 (Fed.Cir.1991); *Air–A–Plane Corp. v. United States*, 408 F.2d 1030, 1032–33 (Ct.Cl.1969). It is not relevant in determining whether a contract was ever formed.

■ Wadsworth also argues that St. George City ordinance 9–5–4(3) prohibits the City from negotiating privately with bidders prior to awarding the contract and therefore the Council must have intended to award the contract when it authorized negotiations. The ordinance provides in relevant part:

> Where a bid exceeds available funds and time or economic considerations preclude resolicitation of work or purchase of a reduced scope or quantity, the Purchasing Agent may negotiate an adjustment of the bid price, including changes in the bid requirements, with the low responsible bidder, in order to bring the low bid within the amount of available funds.

This ordinance does not prohibit negotiations. In fact, it specifically authorizes the City to negotiate price and bid requirements with a bidder when the bid exceeds the available funding for a project and when "time or economic considerations preclude resolicitation of work." Wadsworth argues that the preaward negotiations were not valid because the trial court made no findings that time or economic constraints precluded the City from rebidding the project. We find that the record amply supports the legitimacy of the negotiations. The minutes of the January 10 meeting clearly indicate that to qualify for federal funding for the project, the City needed to award the bid by January 11. The city public works director further testified at trial that the City had projected that sixty-seven percent of the cost of the project would be paid for by federal funds and that these funds were vital to the completion of the project. He also testified that the federal government extended the deadline only after negotiations with Wadsworth failed. Wadsworth did not contradict this testimony. In fact, Wadsworth admitted in its briefs that the City was under pressure to award the bid quickly. Thus, we find that the City properly attempted to negotiate with Wadsworth under section 9–5–4(3) of the City Code.

Finally, Wadsworth asserts that the parties' failure to sign a written agreement pursuant to the January 10 Council meeting does not preclude this court from finding a contract since case law holds that no formal writing is needed to create a binding contract. Because we find that the City did not unconditionally accept Wadsworth's bid at the January 10 meeting, we do not need to reach that issue.

### C. The City's Counteroffer

Wadsworth contends that even if the City did not accept its offer at the January 10 meeting, the City made a counteroffer at that meeting which Mr. Wadsworth later accepted by agreeing to reduce the bid $100,000 by eliminating the skylight and the canopy. The City acknowledges that it made a counteroffer but argues that Wadsworth did not accept it because Mr. Wadsworth wanted to formalize the contract in the amount of the original bid and negotiate a reduction afterward pursuant to the change order provision.

The City argues that this was unacceptable because it would require "[t]rust and reliance by the City on an assurance by Cal Wadsworth" that he would reduce the price sufficiently.

An offeree's proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally. *Iselin v. United States*, 271 U.S. 136, 139, 46 S.Ct. 458, 459, 70 L.Ed. 872, 874 (1926); *R.J. Daum Constr. Co.*, 247 P.2d at 819–20. If the original offeror accepts the counteroffer before it is withdrawn, a binding contract is created. *R.J. Daum Constr. Co.*, 247 P.2d at 819. In this case, the City's conditional acceptance of Wadsworth's bid at the January 10 meeting clearly constituted a counteroffer. However, we agree with the trial court and the court of appeals that Wadsworth did not accept the counteroffer.

A trial court's finding about whether a party accepted an offer or a counteroffer is a finding of fact. *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). We cannot overturn a trial court's factual findings unless they are clearly erroneous. Utah R.Civ.P. 52(a). A finding is clearly erroneous if it is "against the clear weight of evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

The evidence as to whether Wadsworth accepted the counteroffer is conflicting. Mr. Wadsworth testified that when he met with the project engineer, the architect, and Mr. Bulloch on January 29, 1991, they discussed how the required reduction might be accomplished. Because Mr. Wadsworth needed to refer to his bid worksheets before he could commit to any specific reduction plan, he requested his Salt Lake City office to fax him the worksheets. After reviewing them, he met with Mr. Bulloch the following day. Mr. Wadsworth testified that at that meeting, he agreed to reduce his bid by $100,000 by eliminating a canopy and a sky-light. It is undisputed that a reduction of that amount would have brought the project within budget. He further testified, however, that the City also wanted to eliminate a sewer for a further reduction of $77,810. He was unwilling to agree to that reduction for that amount. "If I would have agreed to that, we would have had a job," he testified.

On the other hand, Mr. Bulloch testified that when he and Mr. Wadsworth met on January 30, Mr. Wadsworth "was confident that [a reduction of $100,000] could be accomplished, but only after a contract was signed." In reliance on this testimony, the trial court found that the counteroffer had not been accepted by Wadsworth. We cannot hold that this was clear error. A counteroffer must be unconditionally accepted. Merely expressing confidence that the requested reduction could be made later was insufficient as an acceptance. We therefore hold, albeit for different reasons, that the court of appeals did not err in concluding that a contract did not come into existence between Wadsworth and the City.

**EVIDENCE**

Next we examine Wadsworth's contention that the district court erred in refusing to admit two items into evidence: (1) an article in a trade publication announcing that the City had awarded the project contract to Wadsworth, and (2) a worksheet faxed to Mr. Wadsworth in St. George from his Salt Lake City office confirming that cancellation of the skylight and the canopy would reduce the bid by $100,000. The issue of "[w]hether evidence is admissible is a question of law, which we review for correctness, incorporating a 'clearly erroneous' standard of review for subsidiary factual determinations." *State v. Diaz*, 859 P.2d 19, 23 (Utah Ct.App.1993), *cert. denied*, 878 P.2d 1154 (1994) (citations omitted). An erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful. *State v. Villarreal*, 857 P.2d 949, 957 (Utah Ct.App.1993), *aff'd*, 889 P.2d 419 (Utah 1995). An error is harmful if

it is reasonably likely that the error affected the outcome of the proceedings. "In other words, '[f]or an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict.'" *Id.* at 958 (quoting *State v. Knight,* 734 P.2d 913, 920 (Utah 1987)).

 We conclude, as did the court of appeals, that even if the trial court erroneously excluded the trade publication article and the bid worksheet from evidence, the exclusions were harmless. Wadsworth argues that the trade publication article "has probative value to show that the conduct of the City and the facts surrounding this case were such that the trade publication announced an award to Wadsworth. It is also probative of Wadsworth's reasonable understanding that it had been awarded the Project." However, the significance of this article as it relates to the reasonable understanding of the parties is slight. In addition, the court admitted ample evidence of the parties' conduct to show whether a binding contract was formed, including testimony from City officials, testimony from Mr. Wadsworth, minutes from the January 10 meeting, and letters to Wadsworth from the city attorney. All of the evidence admitted by the court was much more relevant with regard to the parties' conduct than the trade publication article, and we find it highly unlikely that admission of the article would have affected the outcome of the trial.

 We also find that the trial court's exclusion of the bid worksheet was harmless. The bid worksheet would simply have demonstrated that Mr. Wadsworth concluded that he could reduce the bid $100,000 by deleting the skylight and the canopy. However, the admitted testimonies of city officials and Mr. Wadsworth sufficiently demonstrated that point. Mr. Wadsworth's refusal to embody that bid reduction in the written contract, not his refusal to demonstrate that he could reduce the price afterward, prevented Wadsworth from accepting the City's counteroffer. Thus, we find that the trial court did not exclude any evidence that could have resulted in harmful error.

## DAMAGES

Because we conclude, as did the court of appeals, that Wadsworth and the City did not enter into a binding contract, we need not examine whether Wadsworth is entitled to recover lost profits for breach of contract.

Affirmed.

ZIMMERMAN, C.J., STEWART, Associate C.J., and DURHAM and RUSSON, JJ., concur.